GEM HUBBART, APPELLEE, V. HORMEL FOODS
CORPORATION, APPELLANT.

723 N.W.2d 350

Filed October 24, 2006.   No. A-06-096.

James L. Quinlan, of Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C., for appellant.

Michael P. Dowd, of Dowd, Howard & Corrigan, L.L.C., for appellee.

INBODY, Chief Judge, and MOORE and CASSEL, Judges.

INBODY, Chief Judge.

## INTRODUCTION
Hormel Foods Corporation (Hormel) appeals from the judgment of the review panel of the Nebraska Workers' Compensation Court affirming in part and in part reversing the award of the trial court and remanding the cause. For the reasons set forth in this opinion, the judgment of the review panel is affirmed in part and in part reversed, and the cause is remanded with directions.

## PROCEDURAL HISTORY
On May 17, 2001, Gem Hubbart filed an amended petition in the Nebraska Workers' Compensation Court, alleging that "on or about February 8, 2001, [Hubbart] sustained injuries to her bilateral upper extremities in an accident arising out of and in

the course of her employment with [Hormel]." Hubbart asserted that her

> accident and injury occurred as a result of cumulative trauma when [she] was required to engage in the excessive use of her hands in a repetitive fashion during the performance of her work . . . causing her hands to [become] symptomatic and disabl[ed], requiring her to cease employment and seek medical care . . . .

Hubbart indicated that she "was restricted from returning to work until she received carpal tunnel release . . . which surgery [was] set for 3/20/01" and that she had "become depressed secondary to her work related injuries."

On October 25, 2001, Hubbart and Hormel entered into a "Joint Stipulation for Dismissal." In the joint stipulation, the parties agreed that on February 8, Hubbart "sustained injuries to her right and left upper extremities in the nature of carpal tunnel syndrome arising out of and in the course of her employment with [Hormel]"; that "all reasonable and necessary medical expenses incurred by [Hubbart] as a result of the accident have been paid or will be paid by [Hormel]"; and that an agreed-upon vocational rehabilitation counselor should be appointed. On November 2, the compensation court entered its "Order of Dismissal Without Prejudice," generally approving of the parties' joint stipulation and noting that "there exist no present controversies between the parties."

On August 8, 2002, Hubbart filed a "Motion for Approval of Medical Care." In the motion, Hubbart claimed that her "treating physician has opined that she is in need of a repeat right carpal tunnel release which [Hormel] has failed and refused to pay for." Accordingly, Hubbart asked that the court "determine [Hubbart's] entitlement to further care and treatment in the form of the repeat right carpal tunnel surgery." On October 1, the compensation court entered an order, providing the following:

> On the stipulation of the parties, an order of dismissal without prejudice was entered November 2, 2001 which made certain limited findings and dismissed [Hubbart's] petition without prejudice. Neither the stipulation of the parties nor the order of the Court made any findings regarding [Hubbart's] entitlement, if any, to future medical care.

A dispute now exists regarding the necessity for a repeat carpal tunnel surgery, which if approved, will involve not only the cost of surgery, but liability for payment of temporary total disability, possible additional member impairment and a claim for vocational rehabilitation services, all without entry of an award. Having been previously dismissed without prejudice, the proper procedure is to refile a petition. [Hubbart's] motion is denied without prejudice . . . .

On October 30, 2002, Hubbart filed an amended petition. In the amended petition, Hubbart noted the parties' prior joint stipulation and claimed that "subsequent thereto issues arose concerning [Hubbart's] need for additional medical care and treatment associated with her bilateral carpal tunnel syndrome in the form of a repeat right carpal tunnel release." Hubbart further claimed that "a vocational rehabilitation plan [had been proposed] in the form of a GED program as proposed by an agreed upon vocational expert which [Hormel] has failed and refused to approve absent a reasonable controversy." Hubbart alleged that

the outstanding issue to be addressed by the Court in connection with this Petition is the compensability of [Hubbart's] need for a repeat right carpal tunnel surgery to address her work related injuries, and her entitlement to the vocational rehabilitation plan as set forth by the agreed upon vocational expert

in addition to any temporary total and permanent partial disability benefits, as well as any "temporary indemnity benefits," which we infer to mean temporary partial disability benefits, arising from her surgery. Hormel filed its answer on November 5, generally denying Hubbart's allegations and stating that it "approved the original vocational rehabilitation plan but has refused to date to approve an extension of said plan" and that it had paid any and all benefits to which Hubbart was entitled.

After a hearing was had on December 23, 2002, the trial court entered its award on April 30, 2003. In its award, the court held that on January 8, 2001—a month earlier than the date originally pled and stipulated to—Hubbart "was in the employ of [Hormel] as a laborer, and while so employed and on said date and while engaged in the duties of her employment, she suffered bilateral carpal tunnel syndrome as a result of an accident arising out of

and in the course of her employment." The court found that Hubbart was entitled to benefits and awarded temporary total and permanent partial disability benefits. The court further held as follows:

> The parties disputed the necessity of a repeat carpal tunnel release on the right hand as recommended by Dr. Bergstrom. I have reviewed the reports of Dr. Bergstrom and Dr. Teideman and find the recommended surgery reasonably necessary to relieve [Hubbart's] continuing symptoms. [Hormel] shall pay the expense associated with the repeat surgery and future medical expenses reasonably necessary for treatment of [Hubbart's] right carpal tunnel syndrome. There will obviously also be a future period of temporary total disability. [Hormel] is entitled to credit for medical expenses paid.
>
> . . . .
>
> [Hubbart] is entitled to vocational rehabilitation services to restore her to suitable employment within the permanent physical restrictions identified by Drs. Pitz and Bergstrom. If [Hubbart] desires to be evaluated as to her suitability for rehabilitation services, she should contact the Court either by letter, telephone, or in person at the Capitol Building in Lincoln, Nebraska, within 30 days after the date of this Award. . . . If [Hubbart] fails or declines without reasonable cause to indicate her desire for rehabilitation services in the manner and within the time above specified, she shall be deemed to have waived any and all right to such services.

On August 14, 2003, Hubbart filed a motion for vocational services. In her motion, Hubbart asserted that the "nature and extent of [Hubbart's] injuries and her financial circumstances resulted in [Hubbart's] becoming destitute causing, in part, loss of her home during which time she fell out of touch with [her] counsel following the time and entry of this award, and was residing in a homeless shelter." Hubbart claimed that her attorney "made efforts to locate [her] through her last known address, probation officer, and friends" and that she "had eventually reestablished a new home at which time [her] counsel was able to contact her and asked her to come in to retrieve her worker's [sic]

compensation check." Hubbart suggested that "[t]he delay in [her] request for vocational rehabilitation services was directly impacted by her financial circumstances as a direct result of her injuries," and she prayed "for consideration of leave to allow her to seek vocational rehabilitation services."

After a hearing on August 21, 2003, the compensation court entered an order finding "good cause for [Hubbart's] failure to contact her counsel and the Court regarding an evaluation for vocational rehabilitation, which was due primarily to her home-lessness and related circumstances." The court essentially gave Hubbart an additional 30-day period in which to indicate that she desired to be evaluated as to her suitability for rehabilita-tion services.

On February 17, 2004, Hubbart filed an "Application to Modify." In her application, Hubbart claimed that she "requested further medical care and treatment in the form of a repeat left carpal tunnel surgery" and that "[Hormel] has failed and refused to pay for the cost of additional surgery which . . . was eventually performed on November 21, 2003." Hubbart alleged that Hormel "has failed and refused to pay for temporary total disability benefits following the time of [Hubbart's] sur-gery" and that Hubbart "has developed mental overlays sec-ondary to her work-related injuries which [have] rendered her totally disabled at present." She further claimed that the "mat-ters in dispute are payment of [Hubbart's] medical care [and] temporary total disability benefits, together with waiting pen-alties and attorney fees due to [Hormel's] failure and refusal to pay for accrued medical and indemnity benefits absent a rea-sonable controversy."

On May 25, 2004, Hormel filed an amended answer to Hubbart's application to modify. In its amended answer, Hormel "admit[ted] that it has not paid for the cost of left carpal tunnel surgery nor any temporary total disability benefits associated with such surgery for the reason that the condition is not re-lated to or caused by [Hubbart's] employment with Hormel." Hormel generally denied Hubbart's claims and listed two affirmative defenses to the application: that "[Hubbart's] claim for benefits related to 'mental overlay secondary to her work related injuries' is barred by the statute of limitations" and that

"[the same] claim . . . is barred by the doctrine of res judicata." Therefore, Hormel asked that Hubbart's application be dismissed with prejudice.

A hearing was had on Hubbart's application to modify on June 2, 2004. Both parties entered numerous exhibits into evidence, and the contents of these exhibits will be discussed as necessary in the analysis section of this opinion. Hubbart testified in her own behalf. Hubbart said that she came to the United States from Thailand 30 years earlier. Hubbart testified that since the initial litigation began with Hormel, she had not worked anywhere else. She said that she worked for Hormel for 5 years 7 months and that during the course of her employment with Hormel, her work required her to use both hands all day long. Hubbart testified that she first sought medical attention for her hands in February 2001. Hubbart said that she saw a nurse at Hormel and complained of pain in her hands and that the nurse gave her aspirin for the pain. After she had been in pain for 2 weeks, she was sent to see a doctor. Hubbart said that she also saw two other doctors and that all three doctors "agreed that the problems with [her] hands were related to [her] work." Hubbart testified that at the time of trial, she was being treated by Dr. Richard Bergstrom.

Hubbart testified that when she filed her first suit against Hormel in 2001, she had been fired by Hormel; that she was unemployed and without an income; and that subsequently, she became depressed. Hubbart said she had thoughts of suicide. She began to consult with Dr. Thomas McKnight. However, her depression lessened when she began to see a "job expert," "[b]ecause [she] had something [she] looked forward to, and [she] knew [she could] get a job or get [an] education." Hubbart testified that she had surgery on her right hand in March 2001, but that she continued to have problems with her hands after the surgery. She said that doctors recommended that she have a second surgery done on her right hand, which she eventually had on January 30, 2003. Hubbart testified that she did not have any way to pay for that surgery; however, Hubbart said that her doctor performed the surgery because "he [felt] sorry for [her] because [her] hand really hurt" and that "he agreed that [she could] make . . . payment[s] on the surgery."

Hubbart testified that after her second surgery on her right hand, her vocational rehabilitation benefits ceased. She was without an income, so she rented her house to some illegal aliens, who had marijuana in the house. Hubbart testified that "the police put [her] in jail because it was [her] house [and that] when [she went] to the court, the judge [gave her] one year probation." Hubbart testified that she eventually moved into a homeless shelter because her electric utility service was shut off and she had to "move to [the] shelter to get warm." Hubbart testified that she and her attorney "lost communication between one another for a period of time." On April 30, 2003, the compensation court entered an order awarding Hubbart medical expenses and vocational rehabilitation benefits.

Hubbart testified that after she had the second surgery on her right hand in January 2003, she began to use her left hand more. She began to have increasing problems with her left hand, and she explained the problems to Dr. Bergstrom; in the fall of 2003, Dr. Bergstrom suggested that she have surgery on her left hand. Hubbart testified that she asked Hormel to pay for the surgery on her left hand, but that Hormel refused. When asked how the refusal made her feel, Hubbart said, "Hurt, . . . angry, . . . hopeless." Hubbart said that she discussed her depressed thoughts and feelings of hopelessness with Dr. Eugene Oliveto, a psychiatrist, and with a counselor for Lutheran Family Services. Hubbart said that at the time of trial, she was still being treated by Dr. Oliveto and taking medication for her depression. Hubbart said that she wanted Hormel to pay for her ongoing treatment with Dr. Oliveto or with a counselor for Lutheran Family Services.

Hubbart testified that Dr. Bergstrom performed surgery on her left hand on December 9, 2003, but that she had not been able to pay him for performing the surgery. She then described the current state of her hands:

> Both of my hands hurt, [they are] swollen, but I have to take medication for that. I need to take the medication to keep from swelling . . . . It's really hard for me to do anything, any work. I have to ask my husband to help me. He [does] everything for me.

Hubbart said that mentally, she felt "[k]ind of . . . depressed and kind of . . . hopeless" and that she did not "know what's going to happen in [her] future." She admitted that she got divorced in 1996 and that she became depressed as a result, but said that she did "get over that." Hubbart testified, "I've been through it with Hormel, I've been through what they [have] done to me. I've been through the gentleman over there fir[ing] me without no reason . . . . And my hand[s] hurt right now, and I cannot do what I used to do." At the conclusion of Hubbart's testimony, she rested. At the conclusion of all evidence, the trial court took the matter under advisement.

On November 5, 2004, the trial court filed a "Further Award." In its further award, the trial court found and held as follows:

> The Court has previously determined that on January 8, 2001, [Hubbart] suffered bilateral carpal tunnel syndrome as a result of an accident arising out of and in the course of her employment by [Hormel]. [Hubbart] previously underwent bilateral surgeries but on December 9, 2003, underwent a second procedure on her left hand by Dr. . . . Bergstrom after experiencing increasing recurrent symptoms. . . . Dr. Bergstrom provided a sufficient medical causation opinion and opined the second procedure was reasonably necessary . . . . The records indicate the second procedure was effective in reducing [Hubbart's] left hand symptoms. [Hubbart] further argued that secondary to her physical injuries, loss of function and pain syndrome she became disabled due to depression. The evidence is uncontroverted that [Hubbart] has in the past and currently suffers depression, but causation is disputed between the parties. [Hubbart] was referred to Lutheran Family Services for evaluation and treatment. Her family physician, the Lutheran Family Services psychologist and [the] psychiatrist all attribute her depression to her physical injuries, loss of function and pain syndrome, although acknowledging other stressors are contributory . . . . Drs. Terry Davis and Jones-Thurman, who examined [Hubbart] at [Hormel's] direction, likewise diagnosed her depression and indicated it was due in part to her injuries but emphasized other situational factors such as unemployment, drug

use and a recent criminal arrest and conviction. Dr. Jones-Thurman reported, "she does appear to have some depression and anxiety and these may be related to various factors including her medical condition . . . she appears to have several situational factors which have probably contributed to her anxiety and depression." . . . It is not necessary [Hubbart] establish that her depression was caused solely or exclusively by her physical injuries, loss of function and pain syndrome. The evidence does establish her injuries to be a significant, contributing cause of her depression which at present renders her temporarily totally disabled. At the time of her accident and injury [Hubbart] was receiving an average weekly wage of $341.20 being sufficient to . . . entitle her to benefits of $227.47 per week for temporary total disability regarding her left hand from December 9, 2003, through May 20, 2004, a period of 23 2/7 weeks and thereafter and in addition thereto the sum of $227.47 per week for a 12 percent permanent functional impairment of her left upper extremity.

The trial court further found that Hubbart was "entitled to temporary total indemnity of $227.47 per week from and after May 25, 2004, through the date of trial for so long thereafter as [Hubbart] shall remain temporarily totally disabled due to her depression." The court ordered Hormel to pay Hubbart's current medical bills as well as "future medical expenses reasonably necessary for treatment of [Hubbart's] carpal tunnel syndrome and counseling for her depression as recommended by Dr. . . . Oliveto." The court also noted that it made "no finding regarding [Hubbart's] entitlement to vocational rehabilitation services as she has not reached maximum medical improvement regarding her depressive symptoms."

On November 18, 2004, Hormel filed an application for review with the review panel of the Nebraska Workers' Compensation Court. After a hearing, the review panel entered its order of affirmance in part and reversal and remand in part. The review panel first found that "[t]he trial court's finding that [Hubbart's] depression was related to the accident and injury of January 8, 2001, is not clearly wrong and is supported by the record." The review panel noted that "[t]here are sufficient expert medical

opinions from the physicians and psychologists at Lutheran Family Services that [Hubbart's] depression is related to her physical injuries from the accident."

The review panel further found that the trial court erred in failing to evaluate or mention Hormel's affirmative defenses of res judicata and the statute of limitations:

> The further award . . . of the trial court entered on November 5, 2004, found that [Hubbart's] mental stresses were work related and put [Hubbart] on a running award for temporary total disability benefits due to depression. The trial court made no mention of [Hormel's] affirmative defenses that the mental overlay was barred by the statute of limitations or the doctrine of *res judicata*.

> A review of the record shows that [Hubbart] had a prior claim in this case for psychological injuries. This is borne out by [Hubbart's] Amended Petition . . . filed May 17, 2001, where [Hubbart] made a specific request . . . for damages due to depression secondary to work related injuries. The request in the petition of May 17, 2001, for psychological injuries is supported by the facts in this case wherein [Hubbart] sought treatment in June of 2001, by her family physician Dr. McKnight . . . and Dr. McKnight treated [Hubbart] for anxiety and prescribed anti-depressants . . . . [Hubbart] was further treated by Dr. McKnight on August 7, 2001, . . . again for anxiety and depression. Dr. McKnight confirmed that his treatment for depression and psychiatric injury was specifically related to [Hubbart's] work related injuries in his report dated August 8, 2001 . . . .

> The record shows that there [were] more than two years before the next claim for depression was made in the [Application to Modify] of [February] 17, 2004. Depending on how the evidence is viewed, this may or may not be outside the statute of limitations and the claim for psychiatric injuries may or may not be barred by the doctrine of *res judicata* even though the issue had been previously raised. The issues of the statute of limitations and *res judicata* were not specifically discussed by the trial court even though [Hormel] specifically pled the affirmative defenses

and there is evidence in the record that may or may not support [Hormel's] position as indicated above.

[Hormel] is entitled to a reasoned decision by the trial court pursuant to Rule 11 of the Rules of Procedure of the Nebraska Workers' Compensation Court. The review panel will therefore reverse and remand the issue of whether or not [Hubbart's] claim for indemnity for psychiatric injury is compensable pending resolution of the issues of the statute of limitations and *res judicata* by the trial court pursuant to Rule 11. Rule 11 requires that all parties are entitled to a reasoned decision which contains findings of fact and conclusions of law based upon the whole record which clearly and concisely state and explain the rational[e] for the decision so that all interested parties can determine how and why a particular result was reached. Rule 11 requires the judge to specify the evidence upon which the decision is based. Such findings provide the basis for a meaningful appellate review and should be undertaken by the trial court concerning the affirmative defenses of the statute of limitations and *res judicata* as they may pertain to a running award for psychiatric injury.

The review panel further found that although the trial court had mistakenly stated Hubbart " 'underwent a second procedure on her left hand,' " this error was harmless, and that "there is support in the record for the trial court's finding that [Hubbart's] left hand carp[a]l tunnel syndrome surgery and resulting impairment [were] related to the accident and injury of January 8, 2001." Hormel has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Hormel alleges, restated, that the trial court (and, later, the review panel) erred when it failed to conclude that Hubbart's claim for depression was barred by the doctrine of res judicata, that the trial court (and, later, the review panel) erred when it failed to dismiss Hubbart's claim for depression because Hubbart failed to meet her burden of proof, and that the review panel was clearly wrong when it found that the record contained sufficient evidence to support a causal relationship between Hubbart's December 2003 surgery and her January 2001 accident.

## STANDARD OF REVIEW

Pursuant to Neb. Rev. Stat. § 48-185 (Reissue 2004), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Bixenmann v. H. Kehm Constr.*, 267 Neb. 669, 676 N.W.2d 370 (2004). Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id.*

## ANALYSIS

*Doctrine of Res Judicata.*

Hormel alleges that the trial court erred when it failed to find that Hubbart's compensation claim for depression was barred by the doctrine of res judicata. Further, Hormel asserts that the review panel erred when it failed to dismiss Hubbart's claim for her depression based on the doctrine of res judicata. We address these two assignments of error together.

In its order, the review panel concluded that the trial court did in fact err when it failed to address Hormel's affirmative defenses, one of which was the doctrine of res judicata. Specifically, the review panel held:

> The issues of the statute of limitations and *res judicata* were not specifically discussed by the trial court even though [Hormel] specifically pled the affirmative defenses and there is evidence in the record that may or may not support [Hormel's] position as indicated above.
>
> [Hormel] is entitled to a reasoned decision by the trial court pursuant to Rule 11 of the Rules of Procedure of the Nebraska Workers' Compensation Court. The review panel will therefore reverse and remand the issue of whether or not [Hubbart's] claim for indemnity for psychiatric injury is compensable pending resolution of the issues of the statute of limitations and *res judicata* by the trial court pursuant to Rule 11. Rule 11 requires that all parties are entitled

to a reasoned decision which contains findings of fact and conclusions of law based upon the whole record which clearly and concisely state and explain the rational[e] for the decision so that all interested parties can determine how and why a particular result was reached. Rule 11 requires the judge to specify the evidence upon which the decision is based. Such findings provide the basis for a meaningful appellate review and should be undertaken by the trial court concerning the affirmative defenses of the statute of limitations and *res judicata* as they may pertain to a running award for psychiatric injury.

An appellate court will not consider an issue on appeal that was not passed upon by the trial court. *Torres v. Aulick Leasing*, 258 Neb. 859, 606 N.W.2d 98 (2000). In appellate proceedings, the examination by the appellate court is confined to questions which have been determined by the trial court. *Id.* The review panel concluded, and we agree, that the trial court failed to address the affirmative defenses raised by Hormel regarding Hubbart's claims for depression. The review panel found that remand was necessary for the trial court to specifically address these issues. Since the trial court did not address the issues of res judicata or the statute of limitations, we will not address these issues. We therefore find that the review panel's conclusion that remand was required for the trial court to address these issues was proper and affirm that part of the review panel's order.

*Burden of Proof Regarding Depression.*

Hormel next alleges that the trial court (and, later, the review panel) erred when it failed to dismiss Hubbart's compensation claim for depression, because Hubbart failed to meet her burden of proof under Neb. Rev. Stat. § 48-141 (Reissue 2004).

Section 48-141 provides, in relevant part:

All amounts paid by an employer or by an insurance company carrying such risk, as the case may be, and received by the employee or his or her dependents by lump-sum payments, approved by order pursuant to section 48-139, shall be final, but the amount of any agreement or award payable periodically may be modified as follows: (1) At any time by agreement of the parties with the approval of the Nebraska Workers' Compensation Court;

or (2) if the parties cannot agree, then at any time after six months from the date of the agreement or award, an application may be made by either party on the ground of increase or decrease of incapacity due solely to the injury or that the condition of a dependent has changed as to age or marriage or by reason of the death of the dependent.

To obtain a modification, an applicant must prove, by a preponderance of evidence, that the increase or decrease in incapacity was due solely to the injury resulting from the original accident. *Bronzynski v. Model Electric*, 14 Neb. App. 355, 707 N.W.2d 46 (2005). The applicant must prove there exists a material and substantial change for the better or worse in the condition—a change in circumstances that justifies a modification, distinct and different from the condition for which the adjudication had previously been made. *Id.*

We find that the trial court evaluated Hubbart's application to modify based on her depression using an incorrect standard. In its November 5, 2004, award, the trial court noted the following: "It is not necessary [Hubbart] establish that her depression was caused solely or exclusively by her physical injuries, loss of function and pain syndrome. The evidence does establish her injuries to be a significant, contributing cause of her depression which at present renders her temporarily totally disabled." However, as noted above, in order to obtain a modification to a prior award, an applicant must prove that the increase in his or her incapacity was due *solely* to the injury resulting from the original accident. Therefore, we find that the portion of the trial court's award finding Hubbart to be temporarily totally disabled as a result of her depression must be reversed and that the cause must be remanded to the review panel for remand to the trial court for evaluation of the claim using the proper standard.

*Sufficient Evidence.*

Finally, Hormel contends that the review panel was clearly wrong in finding that sufficient evidence existed in the record to support the trial court's finding of a causal connection between Hubbart's December 2003 surgery and her January 2001 injury. Hormel also contends that the review panel erred in finding that the trial court committed harmless error when it relied on an erroneous expert opinion.

The trial court held that Hubbart's December 2003 surgery was a result of her previous carpal tunnel injury suffered during her employment with Hormel. Specifically, the trial court noted:

> The Court has previously determined that on January 8, 2001, [Hubbart] suffered bilateral carpal tunnel syndrome as a result of an accident arising out of and in the course of her employment by [Hormel]. [Hubbart] previously underwent bilateral surgeries but on December 9, 2003, underwent a second procedure on her left hand by Dr. . . . Bergstrom after experiencing increasing recurrent symptoms. . . . Dr. Bergstrom provided a sufficient medical causation opinion and opined the second procedure was reasonably necessary . . . .
>
> . . . .
>
> . . . [Hubbart] is entitled to [have her] medical expenses paid. [Hormel] shall pay future medical expenses reasonably necessary for treatment of [Hubbart's] carpal tunnel syndrome . . . .

In affirming the trial court's findings regarding the causal connection between Hubbart's December 2003 surgery and her January 2001 injuries, the review panel provided:

> [Hormel] alleges the evidence fails to show [Hubbart's] December, 2003, left hand carp[a]l tunnel surgery was caused by the accident and injury of January 8, 2001.
>
> The primary basis for [Hormel's] contention that the left hand carp[a]l tunnel surgery was not work related is that the trial court erred in making the statement . . . that the surgery to the left hand was recurrent because the surgery was "a second procedure on her left hand." [Hormel] is correct in its assertion that this is an incorrect factual statement by the trial court. [Hubbart] did not undergo a second procedure on her left hand. Although this is error, the Court finds that it is harmless error which does not affect the compensability of [Hubbart's] left hand carp[a]l tunnel surgery claim. The mistake in the alleged "second procedure on her left hand" was due to the fact that Dr. Bergstrom was reading prior medical records that could be interpreted as a second surgery having been done on the left hand and Dr. Bergstrom interpreted it to [be] the left

hand. In fact, the second surgery was to the right hand. Be that as it may, the trial court's finding is still accurate based upon the medical records before the Court. The basis of the trial court's finding that the left hand is work related is in reliance on Dr. Bergstrom's opinion that it is recurrent because this was a second surgical event. Even though it was not a second surgical event, the medical evidence still shows that the left hand carp[a]l tunnel was recurrent.

The parties had originally agreed that both the left and right hand carp[a]l tunnel syndrome [was] work related as set forth in the Order of Dismissal of November 2, 2001 . . . . At that time, [Hormel] is correct in its argument that Dr. Pitz found that the left carp[a]l tunnel had resolved and there was no permanent impairment associated with the left hand as set forth in [Hormel's] brief . . . . However, a reading of Dr. Pitz's report of August 13, 2001, . . . shows that Dr. Pitz believes there is a good chance that the carp[a]l tunnel syndrome to the left hand will recur. A complete reading of Dr. Pitz's statement . . . concerning the left hand is as follows: "As for the left carp[a]l tunnel syndrome, at the present time that is resolved. I do not believe that there is any impairment associated with the left hand or upper extremity. It should be noted, however, that it is possible for carp[a]l tunnel syndrome to recur later or slowly progress over time to the point where significant compression of the median nerve could occur that would require surgical intervention. I do not believe that there is any way to predict with any certainty whether or not . . . Hubbart's left hand will eventually develop carp[a]l tunnel syndrome that requires surgical intervention." The prophecy that Dr. Pitz stated in his August 13, 2001, report comes to fruition when Dr. Bergstrom operates on the left hand for carp[a]l tunnel syndrome on December 9, 2003. Since [Hormel] originally stipulated that [Hubbart] had left hand carp[a]l tunnel syndrome, the fact that it did recur finds support in the report of Dr. Pitz . . . and also in the reports of Dr. Bergstrom . . . . Dr. Bergstrom also corrects his misconception of the number of surgical procedures on [Hubbart's] left hand and also discusses that [Hubbart] had

overuse syndrome to the left hand due to the prior right hand surgery . . . .

The review panel finds that the incorrect statement by the trial court that [Hubbart] "underwent a second procedure on her left hand" is harmless error and that there is support in the record for the trial court's finding that [Hubbart's] left hand carp[a]l tunnel syndrome surgery and resulting impairment [were] related to the accident and injury of January 8, 2001.

In June 2001, Dr. Kenneth Pitz opined that while Hubbart did have carpal tunnel syndrome in her left hand, "it is only very mild . . . and therefore surgery is not indicated." However, he did note that "[t]here is no way to predict whether or not she will require carpal tunnel release in the future." Later, in a report dated August 13, 2001, Dr. Pitz noted, "At the present time with no ability to advance any further with [Hubbart's] rehab I believe with reasonable medi[c]al certainty that she has reached maximum medical improvement." He opined, "As for the left carpal tunnel syndrome, at the present time that is resolved. I do not believe that there is any impairment associated with the left hand or upper extremity." However, Dr. Pitz again noted that a worsening of Hubbart's left carpal tunnel syndrome was possible in the future: "[I]t is possible for carpal tunnel syndrome to recur later or slowly progress over time to the point where significant compression of the median nerve could occur that would require surgical intervention." Dr. Pitz again opined that it was impossible to predict whether or not Hubbart would require carpal tunnel surgery on her left hand.

Dr. Bergstrom, in a report dated November 18, 2003, noted:

[Hubbart] is requesting that a repeat surgery be carried out on the left carpal tunnel. From the history, which is present in my notes and those of Dr. Pitz, I feel . . . with a reasonable degree of [medical] certainty that the aggravating and precipitating factor in the development of . . . Hubbart's symptoms of bilateral carpal tunnel syndrome was her employment at . . . Hormel . . . .

Dr. Bergstrom, in a letter dated December 18, 2003, noted that "Dr. Pitz had also done a left carpal tunnel release in March 2001. I did a repeat left carpal tunnel release 9 December 2003 . . . ."

As noted earlier by the review panel, Dr. Bergstrom incorrectly noted that prior to December 2003, Hubbart had received carpal tunnel surgery on her left hand. However, on May 14, 2004, Dr. Bergstrom was deposed, and in his deposition, this error was brought to his attention. Dr. Bergstrom stated that his opinion remained "with a reasonable degree of medical certainty or probability that [his] ongoing treatment of . . . Hubbart, including the left carpal tunnel release, was reasonable and necessary as a result of the cumulative trauma she sustained during the course of her employment with Hormel." Further, on May 20, Dr. Bergstrom filled out a questionnaire in which he opined that "Hubbart's bilateral carpal tunnel syndrome arose as a result of cumulative trauma sustained during the course of her employment at Hormel"; that "Hubbart's bilateral carpal tunnel syndrome has made her susceptible to physical aggravations, from ordinary activities of daily life, which activities would not have otherwise affected her but for the underlying injury"; and that "the aforementioned work-related injuries and aggravations arising secondary thereto necessitated the performance of [Hubbart's] left carpal tunnel release performed on December 9, 2003."

Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Bixenmann v. H. Kehm Constr.*, 267 Neb. 669, 676 N.W.2d 370 (2004). Based on the opinions given by Drs. Pitz and Bergstrom, it is apparent to this court that the review panel did not err in affirming the trial court's determination that Hubbart's need for left carpal tunnel surgery resulted from the injuries she sustained while working for Hormel. Clearly, there is evidence to support the trial court's finding. While it is true that the trial court erroneously noted that Hubbart had two left carpal tunnel surgeries, it is clear that the trial court relied on the opinion of Dr. Bergstrom regarding causation and that Dr. Bergstrom's opinion regarding causation did not change even after he became aware that Hubbart had not had left carpal tunnel surgery before December 9, 2003. Therefore, this error was harmless, as the review panel properly held. We find that the trial court's finding that Hubbart's need for left carpal tunnel surgery was caused by her employment with Hormel was not clearly wrong, and the review panel properly

affirmed this portion of the trial court's award. This assignment of error is without merit.

## CONCLUSION

We find that the trial court evaluated Hubbart's application to modify based on her depression using an incorrect standard, and we accordingly reverse the portion of the review panel's order that affirmed the trial court's award finding Hubbart to be temporarily totally disabled as a result of her depression. The cause is remanded to the review panel for remand back to the trial court for an evaluation of Hubbart's claim using the proper standard and to address the issue of res judicata. Finding no other error in the review panel's order, we affirm the remainder of the review panel's order in its entirety.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.